THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JUDITH ADAMS, Defendant-Appellant.
First District (3rd Division)   No. 1—90—2238

Opinion filed November 25, 1992.

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Donald T. Lyman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a bench trial, defendant, Judith Adams, an employee of the Secretary of State's driver's license division, was convicted of two counts each of bribery (Ill. Rev. Stat. 1987, ch. 38, pars. 33—1(d), 33—1(e)), official misconduct (Ill. Rev. Stat. 1987, ch. 38, pars. 33—1(d), 33—3(b), 33—3(d)), and conspiracy (Ill. Rev. Stat. 1987, ch. 38, par. 8—2), resulting from the sale of a fraudulent driver's license at defendant's place of employment on or about June 22, 1987. Defendant was tried concurrently with Eugene Richardson, who was her supervisor. She was sentenced to 30 months' probation and required to forfeit her public employment.

On appeal, defendant asserts that (1) her out-of-court statements were improperly admitted; (2) the State failed to prove her guilty of conspiracy since there was no evidence that she ever agreed to the scheme; and (3) the State failed to prove her guilty of bribery or official misconduct since there was no evidence that she ever solicited or received funds she knew were intended to influence her performance of an act related to her employment. We reverse defendant's convictions.

In March 1987, after receiving a tip from Andrea Harris, an informant, about fictitious drivers' licenses allegedly being issued, the Illinois State Police initiated an investigation of the driver's license testing facility located at 99th Street and Martin Luther King Drive in Chicago. Five special agents participated in the investigation by visiting the facility with Harris on various occasions in an attempt to obtain fictitious drivers' licenses.

At trial, James Cokely, the operation's admitted bagman, testified for the State in exchange for a probation recommendation on another conviction. He explained the license-for-sale scheme. After Richardson asked Cokely to assist in the scheme, Cokely met with Richardson,

Harris, and Illinois State Police Special Agents Mary Woolery and Graylyn Simpson on April 8, 1987. At that time, Richardson took Cokely and Harris aside and told them that the price for a driver's license would be $500.

On May 27, 1987, Cokely sold a fictitious driver's license to Simpson. On June 4, 1987, Simpson telephoned Cokely at home and gave him information for another fictitious driver's license. Four days later, Woolery and Simpson visited the facility and gave Cokely $500 and the information to be put on the license. Cokely gave the money and information to Richardson and received $75 for his assistance. After Simpson passed the written driving test, Cokely retrieved his application form from the vision counter, took him into the basement, filled out the back of the road test section, and told him to go upstairs to get his license.

On June 22, 1987, Woolery visited the facility with Special Agent Michael Cowling. Cokely took them to his car, where they gave him $500 and showed him the information for the license. Cokely took Cowling into the facility and brought him to Richardson. When Cowling later came to the road test area, Cokely had him sign the back of the application form instead of taking the road test. Cokely signed the application form and sent Cowling back into the building to get a driver's license. When Cokely gave Richardson the $500, he received $75 in return.

Cowling testified that, on June 22, 1987, while wearing a body wire, he and Woolery visited the 99th Street and King Drive driver's license facility. After meeting Cokely, they went to his car, where Woolery paid Cokely $500. When Woolery asked if they could pay less than $500, Cokely stated that he would have to speak with his superiors.

Cowling testified that Cokely took him into the facility through the back entrance and to the vision counter, where he was introduced to Richardson. After handing Richardson a piece of paper with the information for the fictitious driver's license, Cowling followed Richardson into the lobby where applications are taken. From 50 feet away, Cowling saw Richardson speak with defendant, but he could not hear the conversation. Richardson then told Cowling to go to defendant to complete the application. Cowling stated that he saw defendant with the paper that Cowling earlier had given to Richardson.

Cowling testified that defendant requested identification from him three times. When he told her that he did not have any identification, defendant filled out the application with the information that Cowling gave her. At that point, Cowling spoke into his body mike, saying, "it

is all confused." Cowling testified that he had not expected defendant to ask for any identification because she had the paper with the information.

In order to fill out the application, defendant asked Cowling his name. When he gave the name, "Melvin Franklin," defendant asked him to spell the name. She then asked for his address, birthdate, height, weight, glasses, and about his health. All the information that defendant filled out she obtained from Cowling. Defendant then asked Cowling for his social security number. After giving five numbers, Cowling told defendant that he could not remember the last four numbers. Defendant told him to make up some numbers. Defendant finished filling out the application and told Cowling to go to the cashier.

Richardson motioned to Cowling, gave him a completed written test, and told him to sit down and go through the motions. Cowling was then instructed to go outside to take the road test. Without taking the test, he was told by Cokely to go back inside to have his picture taken. Cowling then got his fictitious driver's license in the name of Melvin Franklin.

Agent Frank Murphy, an investigator for the Secretary of State, testified that on January 29, 1988, he interviewed defendant, who identified the writing on the Melvin Franklin application as her handwriting and the voice on the undercover tape as her voice. Defendant told Murphy that she had filled out the application. When Murphy asked defendant how she was involved in that particular driver's license, she replied that she filled out the information on the application with the information that Cowling gave her. She admitted that she did not see any identification from him.

Defendant told Murphy that she was periodically paid by Richardson and Eddie Jones to fill out information on applications. Usually, she was paid $50, but once Richardson gave her $100. She never gave any dates when she received money. On February 23, 1988, defendant was again interrogated by Murphy and gave substantially the same answers.

On cross-examination, Murphy testified that defendant stated that she had no knowledge of fictitious driver's licenses, had no knowledge of any other employees receiving any money for giving any unauthorized assistance, and had never given or seen any employee give an improper exam. At the time of the Franklin application, Jones and Richardson were her supervisors, who sometimes ordered her to complete an application without proper identification. Defendant told Murphy that she completed the application without proper identification

because she was afraid of being written up for insubordination by Richardson or Jones. Defendant also stated that she never saw any money exchanged and she was unaware of any money being exchanged.

Gloria Austen Williams, an employee at the facility, explained the usual and ordinary practices and procedures to obtain a driver's license. When a person enters the facility, she goes to the information desk, shows her identification, and is directed to the application counter, where the clerks fill out the applications. After signing the completed application, the applicant takes the application to the cashier and pays a $10 application fee. The applicant then takes a vision test and a written test, if necessary. The clerk takes the written test from under the counter, puts the application number on the test paper, and has the applicant sign it. After finishing the test, the applicant brings it to the counter to be graded.

If the applicant passed the written test, the clerks mark "pass" on the test, tell the applicant to get her car and pull it around to the testing area, where her form will meet her. The application is then put into a basket on the counter. A clerk comes from the outside and takes the applications to the testing area, which is in an annex building. If the applicant passes the road test, the examiner gives her the application and tells her to go up the backstairs where she will get her license.

Williams also testified that the clerks at the application desk often filled out the applicant's social security number without any verification. It was not proper behavior, however, for the clerk to tell the applicant to make up the number. At some time during the process, the applicant must show identification before getting a driver's license.

Eugene Richardson, who was also a defendant, testified that on June 22, 1987, Cowling did not have an application form when he came to the vision desk. Richardson directed Cowling to the front counter to "the lady in blue," whom he did not know was defendant. Richardson explained that all the clerks wore blue smocks. Richardson stated that he does not know what Cowling did at the front desk, except that he had an application form when he returned to the vision counter.

In addition, Richardson testified that he had previously loaned money to defendant, but did not give her money for any favors. Richardson denied approaching defendant, giving her a piece of paper with information for Cowling's application, or ever asking her to fill out any fictitious applications.

Richardson explained that he had the authority to direct an employee to fill out an application without the applicant having identification. Richardson stated that it is not unusual for him to authorize the application without the person showing identification. Richardson also explained that there was no requirement regarding a social security number, which was not verified, except that a number had to appear on the application. If an employee failed to carry out a supervisor's order, she could be written up for insubordination. Eventually, she could be terminated for multiple write-ups.

After closing arguments, the trial court found defendant guilty of two counts each of bribery, official misconduct, and conspiracy. After denying defendant's motion for a new trial, the trial court sentenced her to 30 months' probation with the requirement that she forfeit her public employment.

On appeal, defendant asserts that her convictions in connection with the license-for-sale scheme should be reversed because the State failed to prove that she agreed to the scheme. She emphasizes that Cokely, the operation's admitted bagman, and Richardson, an accused co-conspirator, never mentioned defendant as part of the scheme. Furthermore, defendant argues, Williams testified that all of defendant's actions were consistent with office procedures and chain of command in effect at the time. Since the key participants testified and none mentioned defendant either as a participant in a conspiracy or as ever having received money for performance of her duties, defendant concludes that there is insufficient evidence to convict her. We agree.

Before addressing the sufficiency of the evidence arguments, we consider defendant's statements to Murphy. Defendant waived the arguments that her statements were inadmissible as evidence of other crimes and that there was no corroborating evidence, exclusive of the confession, which tends to show that a crime did occur and that defendant committed the crime.

■ Nevertheless, defendant's statements cannot be considered as a confession. They are so vague as to time and relation to the particular events that they are meaningless. The statements do not contain any evidence that defendant accepted a bribe to influence her preparation of Agent Cowling's application form. In fact, they lack any specific reference to bribery on the date and relative to Cowling's application. Furthermore, there is no indication that the money given to defendant was pursuant to any incident-specific or ongoing agreement. Defendant could not even recall when she received any money from Jones or Richardson. Moreover, Richardson testified that he occasionally loaned defendant money.

In addition, Murphy testified that defendant denied any knowledge of fictitious licenses being issued, of other employees receiving money for unauthorized assistance, or of any employee administering an improper examination. Defendant also told Murphy that her supervisors, Jones and Richardson, sometimes ordered her to complete an application without proper identification, and that she completed Cowling's application without identification because she was afraid of being written up for insubordination.

■ Taking defendant's statement and the other evidence in the light most favorable to the prosecution, the State did not prove defendant guilty of bribery, official misconduct, and conspiracy beyond a reasonable doubt. Conspiracy is proved by showing (1) an intent to commit an offense; (2) an agreement with another to commit the offense; and (3) the commission of an act in furtherance of the agreement by a co-conspirator. *People v. Harmison* (1985), 108 Ill. 2d 197, 203; Ill. Rev. Stat. 1987, ch. 38, par. 8—2.

■ The State does not have to prove that the conspirators actually met and entered into a specific agreement. (*People v. McNair* (1981), 102 Ill. App. 3d 322, 331.) Instead, the agreement can be by words, acts, or understanding. (*People v. Roberts* (1980), 83 Ill. App. 3d 311, 318.) Furthermore, through circumstantial evidence, conspiracy can be proven by showing a common criminal purpose. (*McNair*, 102 Ill. App. 3d at 331.) Even so, the State must prove that the accused had the specific intent to commit conspiracy. *People v. Lyons* (1954), 4 Ill. 2d 396, 401; *People v. McChristian* (1974), 18 Ill. App. 3d 87, 90.

The State did not prove defendant guilty of conspiracy because it did not prove that she agreed to the license-for-sale scheme or was a knowing participant in the ongoing operation or had the specific intent to commit conspiracy. Therefore, we reverse her convictions for conspiracy.

Next, defendant asserts that the State did not prove her guilty of bribery or official misconduct since (1) there was no evidence that she ever solicited or received funds she knew were intended to influence her performance of an act related to her employment; (2) the State affirmatively established through Cowling that defendant did not act in a manner consistent with the bribery scheme; (3) the evidence showed that defendant at all times acted within office procedures; and (4) the State did not present any evidence that she had violated any law, rule, or regulation.

Instead of knowingly performing an act forbidden by law, defendant maintains that she performed an act affirmatively required by

law. Since defendant's job duties required her to fill out the application and she could have been disciplined for not following Richardson's directives, defendant concludes that the State did not prove that she exceeded her lawful authority or performed an act not authorized by law.

To support her argument, defendant cites *People v. Jordan* (1973), 15 Ill. App. 3d 672, 675, which ruled that receipt of property is not sufficient to sustain a bribery conviction. Defendant finds *Jordan* significant because that defendant, a police officer, accepted $10 from an ambulance driver who answered his emergency call. His accepting the money was alleged to be part of a kickback scheme involving bribes. There was, however, no evidence of either the officer's particular agreement to the scheme nor was there evidence that the officer had summoned the ambulance. The reviewing court found that by accepting the money the defendant merely accepted a gratuity that could not sustain a bribery conviction. *Jordan*, 15 Ill. App. 3d at 675.

The State responds that defendant breached her official duties by improperly filling out a form with information she knew was false and for which the applicant had not supplied proper identification. The State argues that defendant performed her improper acts in the furtherance of the unlawful act only after $500 was solicited and paid to Cokely, who was a co-conspirator. The State maintains that it does not have to prove that defendant personally solicited or accepted the money since she was shown by her actions to be a participant in the conspiracy. In addition, the State contends that defendant was properly convicted of official misconduct because she performed the act of bribery in her capacity as a public employee.

■■ A person commits bribery when:

"(d) He receives, retains or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or

(e) He solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness." Ill. Rev. Stat. 1987, ch. 38, pars. 33—1(d), (e).

■■ The official misconduct charges were based on the bribery charges. Official misconduct occurs when a public officer or employee, in his official capacity:

"(b) Knowingly performs an act which he knows he is forbidden by law to perform; or

\*\*\*

(d) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law." Ill. Rev. Stat. 1981, ch. 38, pars. 33—3(b), (d).

■■ Taking the evidence in light most favorable to the prosecution, the State did not prove that defendant knowingly received or solicited anything of value for filling out the false application on the date in question. Therefore, we find that the State did not prove defendant guilty beyond a reasonable doubt of bribery or official misconduct.

Based on the foregoing, we reverse defendant's convictions for bribery, official misconduct, and conspiracy.

Reversed.

GREIMAN, P.J., and TULLY, J., concur.